## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

### CLARKSBURG DIVISION

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH THE CELLULAR TELEPHONE ASSIGNED CALL NUMBER **(678) 508-5164**, THAT IS STORED AT PREMISES CONTROLLED BY **METRO PCS BY T-MOBILE** | Case No. _1:18mj142_  <br><br> Filed Under Seal |

### AFFIDAVIT IN SUPPORT OF
### APPLICATION FOR A SEARCH WARRANT

Your affiant, I, Lieutenant and Task Force Officer Brian Purkey, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION

1.      I, Lieutenant Brian Purkey, make this affidavit in support of an application for a search warrant for information associated with a certain cellular telephone assigned call number **(678) 508-5164,** ("the SUBJECT PHONE"), that is stored at premises controlled by METRO PCS BY T-MOBILE, a wireless telephone service provider headquartered at 2250 Lakeside Boulevard, Richardson, Texas 75082. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. § 2703(c)(l)(A) to require METRO PCS BY T-MOBILE to disclose to the government copies of the information further described in Section I of

Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review the information to locate items described in Section II of Attachment B.

## **AGENT BACKGROUND**

2. I, Lieutenant Brian Purkey, am employed by the Bridgeport City Police Department as a Lieutenant in the Detective Division. I am assigned as the Commander of the Greater Harrison County Drug and Violent Crimes Task Force. Your affiant is deputized with the Drug Enforcement Administration as a Task Force Agent operating from the Clarksburg, West Virginia, Post of Duty, in the Northern District of West Virginia. Your affiant has been assigned to the Greater Harrison County Drug and Violent Crimes Task Force since February, 2002.

3. Prior to the present task force assignment, I was assigned to the Drug Enforcement Administration as a Task Force Agent for approximately three and a half years, from May 1995 to October 1998. Your affiant has been employed as a Police Officer since November 1991, having received my law enforcement certification from the West Virginia State Police Academy, on July 24, 1992.

4. Your affiant has attended various classes relative to drug identification, trends, investigations, asset removal, undercover operations, clandestine operations and manufacturing, surveillance techniques, drug suppression and eradication, advanced drug enforcement, selective drug enforcement, drug intelligence techniques, vehicle concealment and confidential informant management.

5. As a case agent, I have supervised the controlled purchase of illegal drugs on over approximately 800 occasions and have assisted other case agents with as many as 1200 controlled purchases of illegal drugs. Your affiant has been the case agent or assisted other agents during multiple drug and drug proceeds seizures, including but not limited to; 2000 grams of crack cocaine, 6000 marijuana plants, 300 pounds of processed marijuana, 1000 grams of cocaine, 1000 DSU of LSD, multiple bricks of heroin, over 17,000 packages of synthetic controlled substances, methamphetamine production labs, automatic machine guns, other weapons and bulk cash seizure of over 1 million dollars. I have observed the paraphernalia that accompanies bulk amounts of drugs being processed for distribution. This includes packaging material (baggies, cellophane, etc.) stamped bags, scales, cutting agents (inositol, quinine, etc.), odor masking agents, etc.

6. As a case agent, I have made over 180 Federal drug arrests, most of which involved the distribution of crack, cocaine, heroin, or methamphetamine. Several of those arrests also involved charges of maintaining a drug-involved premises. While working as a drug investigator and acting in an undercover capacity, I have purchased drugs on numerous occasions.

7. In an undercover capacity, I have purchased marijuana, cocaine, crack cocaine base, methamphetamine, heroin, prescription pills, LSD, hallucinogens, ecstasy and hashish. Also while operating in an undercover capacity, I have observed subjects use, conceal and package various drugs and drug paraphernalia. While working in an undercover capacity, I have had subjects attempt to sell me fake substances, baking soda, drywall compound, drywall, nuts, powdered pharmaceuticals, etc. I have readily learned

to identify the difference between actual drugs and counterfeit drugs while in the field through odor, observation and texture.

8.      Your affiant has participated in thousands of hours of surveillance consisting of both physical and electronic observation. I have come to readily recognize, both subtle and obvious activities and or methods of those involved with the, distribution, use, concealment, manufacture, packaging and/or transportation of controlled substances.

9.      I am authorized to investigate violations of United States laws and to execute warrants issued under the authority of the United States. As such, I am a Federal Law Enforcement Officer within the meaning of Rule 41(a), Federal Rules of Criminal Procedure.

## PURPOSE OF THE AFFIDAVIT

10.     Pursuant to Rule 41(c) of the Federal Rules of Criminal Procedure, a warrant may be issued "to search for and seize any (1) property that constitutes evidence of the commission of a criminal offense; or (2) contraband, the fruits of crime, or things otherwise criminally possessed; or (3) property designed or intended for use or which is or has been used as the means of committing a criminal offense[.]"

11.     All the information contained in this affidavit come from my personal observations, my training and experience, and is either personally known to the affiant or, as will be noted, has been provided by other law enforcement officers, witnesses, confidential sources, or was obtained through information, which was previously seized in an ongoing investigation. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all knowledge or all the

investigative findings about this matter. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

12.    Based on the facts set forth in this affidavit, there is probable cause to believe that the crime of Accessory after the Fact to Distribution of Controlled Substance Resulting in Death in violation of Title 18, United States Code, Section 3, and Title 21, United States Code, Section 841(a)(1), has been committed in the Northern District of West Virginia, by Seddrick D. BANKS. There is also probable cause to search the information described in Attachment A for evidence and instrumentalities of these crimes as further described in Attachment B.

## PROBABLE CAUSE

13.    The Greater Harrison County Drug and Violent Crime Task Force and the Drug Enforcement Administration (DEA), in conjunction with the Bartow County, Georgia Sheriff's Office (BCSO), Federal Bureau of Investigation (FBI), and Georgia Bureau of Investigation (GBI), have an ongoing investigation into the death and dismemberment of Courtney Dubois.

14.    On or around May 11, 2018, Mountain Highway Interdiction Unit Trooper Isaac Harmon investigated an incident at the Quality Inn, located in Whitehall, in the Northern District of West Virginia, involving a large amount of methamphetamine discovered in one of the hotel rooms. Through investigation, Trooper Harmon identified

that a Terrick ROBINSON from the State of Georgia rented the hotel room wherein the methamphetamine was discovered.

15.     On May 16, 2018, your affiant and United States Drug Enforcement Administration (DEA) Special Agent (SA) Andrew Simsa interviewed a source of information (SOI1). SOI1 advised that a subject, known to him/her as "T," was in the Fairmont, West Virginia area with a large quantity of methamphetamine. SOI1 described "T" as a black male, approximately 30 years old and from the Georgia area; advised "T" brings pounds of methamphetamine from Georgia to the Fairmont area for distribution; and advised that a white male, approximately 25 years old and known to SOI1 only as "Will", has accompanied "T." SOI1 stated that "Will" carries guns, and acts as security for "T".

16.     On May 22, 2018, SOI1 contacted your affiant and advised that "T" and "Will" were at the Fairfield Inn Hotel in Whitehall, West Virginia. SOI1 advised that "T" had a large supply of methamphetamine with him, but "T" and "Will" were getting ready to move to another hotel. SOI1 advised that "T" had the methamphetamine in a blue and red duffel type bag. SOI1 further advised that "T" and "Will" were driving a blue Kia. Your affiant contacted Detective Brice Fisher with the Three Rivers Drug Task Force, and advised Detective Fisher of the information.

17.     Detective Fisher travelled the Fairfield Hotel in Whitehall and observed a black male and a white male exit the hotel carrying a blue and red duffel bag. Detective Fisher further observed the two males enter a blue Kia bearing Georgia registration and exit the parking lot. Your affiant requested Detective Fisher to initiate a stop on the vehicle.

Detective Fisher advised that a Whitehall Police Department patrol car followed the blue Kia, but failed to stop the vehicle. Detective Fisher further advised that the occupants of the Kia appeared to be nervous; returned to the hotel; and the two males entered the hotel.

18.    After the above described incident, SOI1 contacted your affiant and advised that "T" told SOI that they hid the drugs and were leaving the hotel, because the police were around the hotel.

19.    On May 23, 2018, SOI1 advised your affiant that "T" and "Will" had checked into the Best Western Hotel located in Bridgeport, West Virginia. SOI1 advised that "T" and "Will" had a large supply of methamphetamine and were staying in either room 225 or 252, but could not recall which room for certain.

20.    On May 23, 2018, your affiant went to the Best Western Hotel, 100 Lodgeville Road, Bridgeport, in the Northern District of West Virginia. Your affiant spoke to the hotel management and learned that room 225 was rented by Greg CHAPPELL from the state of Georgia. Your affiant obtained surveillance video from the Best Western Hotel, and confirmed that Terrick ROBINSON (T) and a white male subject entered and left room 225. Your affiant also located a blue Kia, bearing Georgia registration RAD6987, that was registered to Greg CHAPPELL. Your affiant obtained a photograph of Greg CHAPPELL, and sent it to SOI1, who identified CHAPPELL as "Will."

21.    During the investigation, "Will" or Greg CHAPPELL was identified as William Gregory CHAPPELL.

22.    On July 23, 2018, your affiant and SA Simsa interviewed a second source of information (SOI2). SOI2 advised the agent of his/her recent arrest for possession of

approximately 500 grams of methamphetamine, and advised that the source of supply for that methamphetamine was a black male subject, known only as "T," from the Georgia area. SOI2 viewed a mugshot photograph of Terrick ROBINSON from Cartersville, Georgia. SOI2 identified Terrick ROBINSON as the individual known to him/her as "T." SOI2 advised that ROBINSON would bring several pounds of methamphetamine to West Virginia each time he travelled to the area. SOI2 advised that when ROBINSON comes to West Virginia, ROBINSON stays in hotels, but delivers the methamphetamine to SOI2's residence. SOI2 also explained that ROBINSON has a guy with him that carries guns to protect ROBINSON, the drugs, and the proceeds from the drugs.

23. On Saturday, August 11, 2018, an employee of the Bartow County Waste Management Service Cedar Creek Collection Center, located at 15 Cedar Creek Road, Cartersville, Georgia, noticed a strange item in one of the dumpsters. The employee sealed the dumpster. On Monday, August 13, 2018, the dumpster was moved to the Bartow County Landfill and set aside for inspection. Employees inspected the contents of the dumpster and located a black plastic bag that contained what appeared to be the lower torso of a human. The employees called the Bartow County Sheriff's Office ("BCSO"). BCSO detectives searched the rest of the dumpster and located six additional black plastic bags which all contained human remains. All seven of the bags were located in the same section of the dumpster. The human remains were transferred to the Georgia Bureau of Investigations ("GBI") Crime Lab, in Decatur, Georgia, where the GBI medical examiner performed an autopsy. The medical examiner determined that the human remains were from a Caucasian female, 18-35 years old, 5'2" to 5'6" in height with a medium build. The

medical examiner immediately noted that all of the dismemberment of the body appeared to be post-mortem. Detectives canvased all local law enforcement agencies in the area and found no reported matching missing persons. The Cedar Creek Collection Center is approximately 3.5 miles from I-75.

24. On Monday, August 20, 2018, investigators interviewed ███████, who claimed to have information relevant to the unidentified female. ███████ told investigators that █, ROBINSON, and CHAPPELL had been traveling from Bartow County, Georgia, to West Virginia over the previous few months to sell methamphetamine and marijuana out of their hotel room. ███████ advised they would travel to West Virginia, because they could make four times the profit on the drugs by selling in West Virginia rather than selling in Georgia.

25. ███████ advised that during the week of August 6, 2018, █, ROBINSON, and CHAPPELL sold drugs out of their Days Inn motel room, located in Jane Lew, West Virginia. On Thursday, August 9, 2018, ROBINSON brought an unknown white female to the hotel room, and she hung out with the three men all day. That night, the foursome went to the Outback Steakhouse, in Bridgeport, West Virginia, and ate dinner together. After dinner, they returned to their Jane Lew hotel room.

26. ███████ advised that after returning to the hotel room, the female snorted a line of heroin given to her by ROBINSON and overdosed. ROBINSON, ███████, and CHAPPELL were present when the female overdosed. ███████ revealed that ROBINSON made a phone call to "Big Homie" in an effort to find narcan, but was unsuccessful. ███████ and CHAPPELL left the room with all three men's luggage and

rented a room at the Days Inn located in Sutton, West Virginia. ▮▮▮▮ and CHAPPELL left ROBINSON at the room with the female who was overdosing.

27.    ▮▮▮▮ further stated that the next morning, August 10, 2018, ▮▮▮▮ and CHAPPELL returned to the hotel in Jane Lew to check on ROBINSON and found ROBINSON inside with the unknown female's body. ▮▮▮▮ believed the female was still alive, but her color was very blue to purple and ▮ thought that she did not look good. ROBINSON told ▮▮▮▮ and CHAPPELL to get him a gas can, matches, and a shovel so he could dispose of the female's body. ▮▮▮▮ and CHAPPELL acted like they were leaving to get the supplies, but instead left ROBINSON at the hotel room with female's body and drove back to Cartersville, Georgia.

28.    ▮▮▮▮ and CHAPPELL arrived back in Cartersville late in the afternoon of August 10, 2018. ROBINSON called ▮▮▮▮ and CHAPPELL repeatedly on their ride home and threatened to kill them if they did not come back and pick him up. ▮▮▮▮ and CHAPPELL split up once they got home, and ▮▮▮▮ has not heard from CHAPPELL since.

29.    ▮▮▮▮ advised that on Sunday, August 12, 2018, ROBINSON showed up at ▮▮▮▮'s house in Cartersville, Georgia, and tried to fight ▮▮▮▮. ROBINSON told ▮▮▮▮ that he "took care of the problem" with the female at the hotel room in West Virginia. ROBINSON told ▮▮▮▮ that he cut the female up into pieces with a chainsaw and disposed of her body.

30.    ▮▮▮▮ did not identify who drove ROBINSON and ▮▮▮▮ body from West Virginia to Bartow County, Georgia.

31.    On or about August 20, 2018, members of the West Virginia State Police confirmed that ROBINSON had stayed in Room 117 at the Days Inn, located in Jane Lew, West Virginia between August 6, 2018, and August 10, 2018.

32.    On or about August 20, 2018, your affiant contacted Georgia law enforcement, and was briefed about the information provided by ████████. Subsequently, your affiant was provided two recorded statements provided by ████████, and reviewed the same.

33.    On August 25, 2018, members of the West Virginia State Police obtained surveillance from the Outback Steakhouse located in Bridgeport, West Virginia, where ████████ said the three men and the unidentified female ate dinner. The video corroborated ████████'s statement.

34.    The Georgia Bureau of Investigations confirmed the identity of the female body found dismembered in the Bartow County landfill through postmortem and antemortem dental records/x-rays, photographs of unique tattoos, and verbal verification by family members as ████████, a resident of Fairmont, Marion County, West Virginia.

35.    On August 20, 2018, SA Simsa received information from Charleston, West Virginia DEA SA Brian Roscoe that the DEA had a parallel investigation regarding a subject from the Georgia area, known as "T," who was distributing methamphetamine in the Fairmont, Northern District of West Virginia area. SA Roscoe further explained that a confidential informant (CI) had seen "T" with five pounds of methamphetamine. SA

Roscoe advised that "T" was currently in the Georgia area, but that he was coming back to West Virginia in the next couple of days.

36.    On August 21, 2018, SA Roscoe advised that he had information, through electronic surveillance, that "T" was returning to West Virginia. At approximately 10:18 p.m., SA Roscoe advised that "T" was at the Days Inn, located in Jane Lew, in the Northern District of West Virginia.

37.    On August 22, 2018, at approximately 9:00 a.m., Three Rivers Drug Task Force Lieutenant Doug Yost located a silver Dodge Charger, bearing Georgia registration RMS9737, parked at the Days Inn, located in Jane Lew. Lieutenant Yost observed a black male subject exit the hotel and enter into the silver Dodge Charger, bearing the Georgia registration. Lieutenant Yost identified the black male subject as Terrick ROBINSON. Lieutenant Yost also observed a white male subject in the area that seemed to be associated with ROBINSON.  Further surveillance units observed several subjects enter room 110, stay a short time, and leave room 110, behavior indicative of drug trafficking to the task force officers.

38.    On August 22, 2018 at approximately 2:00 p.m., SA Roscoe advised that the CI entered room 110 at the Days Inn in Jane Lew, West Virginia, and observed both ROBINSON and approximately one pound of methamphetamine inside the room.

39.    On August 24, 2018, SA Roscoe advised that they utilized the CI to make a purchase of approximately 120 grams of methamphetamine and approximately 1.5 grams of heroin or fentanyl from ROBINSON. SA Roscoe advised law enforcement was able to monitor ROBINSON through electronic surveillance prior to the controlled purchase. SA

Roscoe advised that ROBINSON departed the Days Inn in Jane Lew, West Virginia; ROBINSON traveled to the Fairmont, West Virginia area; and ROBINSON then drove south to the Speedway Gas Station in Elkview, in the Southern District of West Virginia, where ROBINSON met with the CI and delivered the methamphetamine and heroin.

40.     SA Roscoe advised that during the controlled delivery, ROBINSON had a black male subject and a white male subject with him.  Your affiant supplied SA Roscoe with photographs taken on August 22, 2018, from the surveillance at the Days Inn in Jane Lew, West Virginia.  SA Roscoe advised that he believed the photographs depicted the same subjects that were present during the controlled delivery. SA Roscoe advised that the white male subject actually possessed the drugs before being distributed to the CI through ROBINSON.

41.     SA Roscoe also confirmed that the vehicle that ROBINSON and the other subjects were in during the controlled purchase was the silver Dodge Charger bearing Georgia registration RMS9737.

42.     On September 4, 2018, SA Roscoe advised that ROBINSON had contacted the CI and advised that he (ROBINSON) was headed back to West Virginia with a substantial amount of methamphetamine for distribution.  SA Roscoe was able to confirm ROBINSON's location and movement with electronic surveillance.

43.     On September 4, 2018, ROBINSON advised the CI, while in the presence of SA Roscoe, that the controlled purchase by the CI would occur at a Red Roof Inn in the Fairmont, West Virginia area.

44.     On September 4, 2018, the CI made a controlled purchase of approximately 495 grams of methamphetamine for $5,500.00 from ROBINSON while ROBINSON was in room 202 of the Red Roof Inn, located at 42 Spencer Drive, Whitehall, Marion County in the Northern District of West Virginia.

45.     Task force officers verified through Red Roof Inn personnel that room 202 was registered to ROBINSON.

46.     Directly after the controlled purchase, surveillance was conducted on ROBINSON. Agents observed ROBINSON leave Room 202 and exit the parking lot. Law enforcement maintained surveillance on ROBINSON as he drove through the Fairmont, West Virginia area.

47.     Following the controlled purchase, law enforcement simultaneous executed the search warrant on Room 202 and the traffic stop and search warrant execution of the vehicle on ROBINSON. During the execution of the search warrant on Room 202, of the Red Roof Inn, law enforcement located approximately 2700 grams of methamphetamine, approximately 500 grams of cocaine, firearms, three cellular phones, the buy money of $5,500.00, and CHAPPELL and BANKS. CHAPPELL was armed with a pistol in a holster. Law enforcement located BANKS in the bathroom attempting to flush controlled substances in the lavatory. A pistol was located in the bathtub within a few feet of BANKS. Law enforcement arrested BANKS and CHAPPEL.

48.     Law enforcement determined BANKS to be a resident of the Cartersville area of Bartow County, Georgia, and was wanted on an active warrant from Georgia. BANKS was further identified as the younger brother of ROBINSON.

49.     Your affiant also located approximately 120 grams of suspected heroin or fentanyl in Room 202 of the Red Roof Inn.

50.     During the traffic stop, law enforcement executed the search warrant for the vehicle and arrest warrant for ROBINSON.  In the vehicle, law enforcement located one pistol, an AR style rifle, a shotgun, and a .22 caliber rifle.  A search of ROBINSON revealed two magnetic key cards in a Red Roof Inn key folder with the #220 written on the key folder, as well as $17,333.00 and cellular phone ROBINSON identified as his phone.

51.     On or about October 15, 2018, your affiant received GPS location information for ROBINSON's cellular phone from the Georgia Field Office of the Federal Bureau of Investigation (FBI). The GPS information revealed, among other information, the travel pattern of ROBINSON between August 9, 2018, and August 11, 2019.  Specifically, the GPS location information revealed that as of 10:28 p.m. on August 9, 2018, ROBINSON was located at the Meadowbrook Mall, in Bridgeport, West Virginia, but returned to his Jane Lew area where his hotel room was located as of approximately 10:41 p.m. on August 9, 2018.

52.     The GPS location information revealed ROBINSON left the area of the Jane Lew hotel just after 2:00a.m., on August 10, 2018, and began travelling south toward the state of Georgia. Subsequent GPS location data revealed ROBINSON's travel south and ultimate arrival at approximately 11:30 a.m. on August 11, 2018.

53.     The Bartow County Sheriff's Office and the Georgia Field Office for the FBI analyzed location information for CHAPPEL's cellular phone.  Consistent with

JIMENEZ's statement, CHAPPEL's location information revealed CHAPPEL arrived in the state of Georgia approximately 9 hours before ROBINSON arrived in Georgia.

54. The Division of Forensic Sciences for the Georgia Bureau of Investigations conducted an autopsy on the remains of▮▮▮▮▮▮▮▮▮▮. The examination of the remains of ▮▮▮▮▮▮▮▮ included, among other analysis, a toxicological and anthropological analysis. By Toxicology Report from the Division of Forensic Sciences for the Georgia Bureau of Investigations, samples taken from the liver returned a positive result for methamphetamine at 1.9 mg/kg and fentanyl at .51 mg/kg. Samples taken from the chest fluid retuned a positive result for methamphetamine at .44mg/L, fentanyl at 12 micrograms/liter, and acetyl fentanyl at less than 2.5 micrograms/liter.

55. The autopsy report included in its findings that ▮▮▮▮▮▮▮▮▮▮▮▮ had been dismembered into seven portions; head and neck (1); torso (2); and upper and lower extremities (4). The forensic anthropological analysis relied upon by the medical examiner revealed that characteristics of the sharp force bone defects (dismemberment) were made with a wide blade mechanical saw, suggestive of a chain saw. The cause of death was found to be the combined effects of fentanyl, acetyl fentanyl, and methamphetamine. The manner of death, however, was ruled undetermined, because the medical examiner noted, that due to the extensive sharp force trauma and moderately decomposed remains, antemortem homicidal violence could not be ruled out.

56. Pursuant to the executed search warrants, your affiant analyzed the call and text data from the four phones seized on September 4, 2018. Two of the four

phones seized were able to be identified as belonging to ROBINSON, that is phones ending in call numbers 9269 and 8172. Of the two remaining cellular phones, one phone belonged to CHAPPEL, and one phone, ending in call number **678-508-5164** (SUBJECT PHONE), belonged to BANKS.

57. A forensic analysis of ROBINSON's cellular phones revealed two phone calls from the 8172 call number to "Big Homie" at 11:52 p.m., as previously stated by ███████. Based upon the video from the Outback Steakhouse, GPS location data from ROBINSON's, the analysis of the call and text information from ROBINSON's phones, and █████'s statement, ██████████ was provided a controlled substance and overdosed on said substance between 10:41 pm and 11:52 p.m. on August 9, 2018.

58. The analysis of ROBINSON's cellular phones also revealed numerous calls from ROBINSON to CHAPPELL and to ████████ during the time ████████ and CHAPPEL were travelling from the West Virginia to Georgia.

59. The analysis of ROBINSON's cellular phones further revealed 14 phone calls between ROBINSON and BANKS between the time ████████ was provided controlled substances and overdosed and the time ROBINSON left the Jane Lew hotel area and began his travel south. The first phone call from ROBINSON to BANKS was at 11:24 a.m., on August 10, 2018, and the last phone call was at 9:31 p.m. on August 10, 2018. However, ROBINSON's cellular phone reveals zero calls between ROBINSON and BANKS during the time the GPS location information reveals ROBINSON travelled from West Virginia to Georgia.

60.     As a part of the investigation, your affiant determined that the travel time between Jane Lew, West Virginia, and Bartow County, Georgia, to be approximately 10 hours.

61.     The forensic analysis of **678-508-5164** (SUBJECT PHONE), belonging to BANKS, revealed a text message from BANKS to ▮▮▮▮, on August 10, 2018, at 2:19a.m., in which BANKS states, "No service I'm in the mountains." Later, at 3:06 a.m., Banks texted ▮▮▮▮, "West Virginia[.]"

62.     The forensic analysis of **678-508-5164** (SUBJECT PHONE), belonging to BANKS, also revealed a picture that had been deleted of ▮▮▮▮▮▮ unclothed in a bathtub. The photograph clearly depicts foam exuding from the mouth of ▮▮▮▮ ▮▮▮▮, a recognized consequence of the absence of oxygen in a drug overdose.

63.     On November 15, 2018, your affiant travelled to the Days Inn motel room, located in Jane Lew, West Virginia. Your affiant viewed the bathtub in room 117, that being the room utilized by Terrick Robinson during the week of August 6, 2018 through August 10, 2018, and it appeared to be the same type of bathtub depicted in the photograph of ▮▮▮▮ found on the SUBJECT PHONE belonging to BANKS.

64.     The forensic analysis of **678-508-5164** (SUBJECT PHONE), belonging to BANKS, also revealed series of pictures of BANKS in a TYVEK full body suit and foot covers. In the pictures, what appears to be blood and blood spatter on the upper body portion of the TYVEK suit and the leg and feet area with on the TYVEK suit is visible.

65.   In my training and experience, I have learned that METRO PCS BY T-MOBILE is a company that provides cellular telephone access to the general public.  I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide service, including cell-site data, also known as "tower/face information" or "cell tower/sector records."  Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected.  These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas.  Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device.  Accordingly, cell-site data provides an approximate location of the cellular telephone but is typically less precise than other types of location information, such as E-911 Phase II data or Global Positioning Device ("GPS") data.

66.   Based on my training and experience, I know that METRO PCS BY T-MOBILE can collect cell-site data about the SUBJECT PHONE.  I also know that wireless providers such as METRO PCS BY T-MOBILE typically collect and retain cell-site data pertaining to cellular phones to which they provide service in their normal course of business in order to use this information for various business-related purposes.

67.   Based on my training and experience, I know that wireless providers such as METRO PCS BY T-MOBILE typically collect and retain information about their subscribers in their normal course of business.  This information can include basic personal

information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless telephone service. I also know that wireless providers such as METRO PCS BY T-MOBILE typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular phone and other transactional records, in their normal course of business. In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify the SUBJECT PHONE's user or users and may assist in the identification of co-conspirators and/or victims.

## **AUTHORIZATION REQUEST**

68.     Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41. The requested information is necessary to determine the location of the SUBJECT PHONE on and between August 9, 2018, and into and including August 12, 2018.

69.     I further request that the Court direct METRO PCS BY T-MOBILE to disclose to the government any information described in Section I of Attachment B that is within its possession, custody, or control. Because the warrant will be served on METRO PCS BY T-MOBILE, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

70.     I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to

delay notice until 30 days after the collection authorized by the warrant has been completed. There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscriber or user of the SUBJECT PHONE would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy or tamper with evidence, notify confederates, or intimidate potential witnesses. *See* 18 U.S.C. § 3103a(b)(1). As further specified in Attachment B, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property. *See* 18 U.S.C. § 3103a(b)(2). Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above. *See* 18 U.S.C. § 3103a(b)(2).

71.    I further request that the Court order that all papers in support of this application, including, but not limited to, the affidavit and search warrant, be **SEALED** until further order of the Court in order to avoid premature disclosure of the investigation, guard against the destruction or tampering with evidence, the notification of confederates, or the intimidation potential witnesses, except that working copies may be served on investigating agents as defined in this affidavit and federally deputized state and local law enforcement officers and METRO PCS BY T-MOBILE, as necessary to effectuate the Court's Order. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize the

investigation, including by giving the target an opportunity to notify confederates who may destroy or tamper with evidence or intimidate potential witnesses.

## OATH

The information in this affidavit is true to the best of my knowledge and belief.

Respectfully submitted,

_____

Lieutenant Brian Purkey
Commander of the Greater Harrison
County Drug and Violent Crime Task Force

Subscribed and sworn to me on this _____ day of November, 2018

_____

Michael J. Aloi
United States Magistrate Judge for the
Northern District of West Virginia